# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

TRACEY POPE,

    Plaintiff,

v.

LAS VEGAS METROPOLITAN
POLICE DEPARTMENT, *et al*.,

    Defendants.

Case No. 2:12-cv-01867-LDG (PAL)

**ORDER**

    The plaintiff, Tracey Pope, alleges that defendant Randy Sorensen, an officer with defendant Las Vegas Metropolitan Police Department, used excessive force against him. Pope filed a complaint alleging 42 U.S.C. §1983 claims for violations of the Fourth and Fourteenth Amendments, and state claims for Intentional Infliction of Emotional Distress; Negligent Training, Supervision, and Control; Battery; and Negligence.  The defendants, who filed an answer, have moved for judgment on the pleadings (#18) and for summary judgment (#26).  In connection with the latter motion, the defendants have moved in limine to exclude statements recorded in the nurse's and physician's emergency room medical records as hearsay (#28).  The plaintiff has opposed these motions, and has moved to file an amended complaint (#20) that addresses an issue raised in defendants' motion for

judgment on the pleadings. The defendants have also moved in limine to exclude the Mr. Donald Teti, the plaintiff's police practice expert, and his proffered expert testimony (#38). Having considered the pleadings, the arguments of the parties, and admissible evidence submitted by the parties, the Court will grant the defendants' motions in limine and for summary judgment, and will deny the remaining motions as moot.

Motion for Summary Judgment

In considering a motion for summary judgment, the court performs "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *United States v. Arango*, 670 F.3d 988, 992 (9th Cir. 2012). To succeed on a motion for summary judgment, the moving party must show (1) the lack of a genuine issue of any material fact, and (2) that the court may grant judgment as a matter of law. Fed. R. Civ. Pro. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Arango*, 670 F.3d at 992.

A material fact is one required to prove a basic element of a claim. *Anderson,* 477 U.S. at 248. The failure to show a fact essential to one element, however, "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. Additionally, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 638 (9th Cir. 2012) (quoting *Anderson*, 477 U.S. at 252).

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "Of

course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.*, at 323.  As such, when the non-moving party bears the initial burden of proving, at trial, the claim or defense that the motion for summary judgment places in issue, the moving party can meet its initial burden on summary judgment "by 'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Id.,* at 325.  Conversely, when the burden of proof at trial rests on the party moving for summary judgment, then in moving for summary judgment the party must establish each element of its case.

Once the moving party meets its initial burden on summary judgment, the non-moving party must submit facts showing a genuine issue of material fact.  Fed. R. Civ. Pro. 56(e); *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000).  As summary judgment allows a court "to isolate and dispose of factually unsupported claims or defenses," *Celotex*, 477 U.S. at 323-24, the court construes the evidence before it "in the light most favorable to the opposing party." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).  The allegations or denials of a pleading, however, will not defeat a well-founded motion.  Fed. R. Civ. Pro. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  That is, the opposing party cannot "'rest upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for trial.'" *Estate of Tucker v. Interscope Records*, 515 F.3d 1019, 1030 (9th Cir. 2008) (quoting Fed. R. Civ. Pro. 56(e)).

Background

This case concerns whether Officer Sorenson used excessive force when he "quickly took [Pope] to the ground" around 5:22 a.m., on October 30, 2011. The only other identified participant[1] to this event, Pope, cannot offer any testimony regarding the force used by Officer Sorenson in taking him to the ground, as he testified that he cannot remember what happened.

In 1980, Pope suffered a severe injury to his spine. While he drove a vehicle in 2011 without assistive devices, he primarily used a walker to walk. Though Pope lived on the second story of an apartment building that lacked an elevator, he testified that his access to his apartment using stairs required that he rely on the rails of the stairway, and his use of the stairs was often slow.

In his deposition, Pope recalled, on the night in question, going to a coffee shop shortly after midnight. Sometime after 1:00 a.m., a man (whom Pope did not recognize) asked him to pick up a woman named Kim (whom Pope thought he might know, based on her description as given by the man) at a gas station and give her a ride back to the coffee shop. Pope went home, changed his pants (as he had spilled coffee on them), and about 2:00 a.m. proceeded to drive his silver Chevrolet Malibu, with a personalized "Lone Ranger" license plate ("LONERGR"), to pick up and give the woman a ride.

By 3:00 a.m., Pope was lost and had given up on finding the cross-street where the woman was waiting. At some point, while attempting to go home, he recalled driving on Torrey Pines, believing he was heading south (but actually driving north), when his car hit a "ditch" (which Pope described as a "big drop," "where the pavement ends and jumps to dirt"), bottomed out, and died. He got out of the car, checked to see if anything was leaking, got back in and tried (without success) to restart the car. He got back out of the

---

[1] In his deposition, Pope testified that four officers arrived at the scene, but was unable to identify any but Officer Sorenson. Officer Sorenson testified that he was the only officer present at the scene when he took Pope to the ground.

4

car, decided to wait until it got light, checked his cell phone for the time, and "it was 5:15, 5:30."

A couple driving home from a Halloween party witnessed Pope's drive north on Torrey Pines. At 4:41:24 a.m., David Tuttle called 911 to report what he believed was a drunk driver driving a silver Chevy Malibu, license plate "LONER GR." Tuttle reported that "he was just all over the road," and "there's a couple of little dips out here that are kinda big, he hit a couple of those pretty hard. But he was just all over the road." After seeing the car come to a stop in the dirt lot, Tuttle believed the driver had broken his car, or destroyed his oil pan, "by hitting one of those in-between streets that has a big dip in them."

Officer Sorenson and Pope provide differing accounts of what followed next. According to Pope, he was standing outside of his car when two patrol cars arrived and sat on the opposite side of the road for about five minutes. He got back inside his car, tried again to start the car, and got back out of the car. Two officers got out of each car and the four officers walked over together. In his deposition, Pope believed there was one female and the rest were male. Pope stated he could just remember the one officer, the one who did "the write-up in the jail," who was male, white, brown hair, skinny, and taller than Pope (who described himself as 5'3").

As described by Pope, the next events were:

Well, they walked over, they asked me what happened, first. Walked, they walked over, asked me what happened, and I said, "I hit a ditch." And they said, "What ditch?" And I point, said "The one back there." And by the time I turned back around and made it down to the last officer, that's the last I remember until I was in the back seat of the police car, handcuffed in the back seat. . . ."

Pope then recalls being transported to the jail, with two officers in the front of the patrol car.

By contrast, Officer Sorensen states in his affidavit that he was by himself when he first arrived at the scene where Pope's vehicle had died. He saw Pope, who had exited the

5

driver's door, and had looked at Officer Sorensen "in a bewildered manner." Officer Sorenson exited his vehicle, and told Pope to walk to the front of the patrol car. Pope mumbled something, and after a second request Pope "stated 'one second' and then he reached into his car." Officer Sorenson states this raised his level of concern. He drew his firearm and instructed Pope to put his hands where they could be seen. Pope "initially showed his hands and then began to pat around his waistline with his hands as if he was searching for something located on his body."

Officer Sorensen states the following occurred:

> I instructed him to walk to the front of my police car again. I had moved further south after he was failing to walk north to the front of my car. This time he began to walk, but not in the direction I instructed him to go. He instead walked sideways and to the south towards me using the car for balance as he moved. I ordered him to the front of my patrol car so I could use the vehicle for protection should he seek to engage me physically to evade arrest. He continued to ignore my instructions to walk to the front of my car and he continued to move towards me still using the car for balance. While he was leaning forward on the car for balance with his back to me, I grabbed both his arms in attempt [sic] to place him in handcuffs.
> Immediately after I grabbed onto his arms he attempted to break free from my grasp by pulling his hands out sideways from me. Consequently I quickly took him to the ground where he landed on his right side on top of the dirt. I took him to the ground with a controlled take down to obtain a position of advantage in order to overcome his resistance and get him secured in handcuffs.

Officer Sorenson then patted Pope down and "found a .357 revolver in a holster located inside his front waistband."

After Pope was handcuffed, Officer Sorenson advised dispatch that Pope had attempted to fight with him, but was in custody. Noting injuries on Pope (including a cut under the eye and bleeding around the mouth), Officer Sorenson also requested medical for Pope. Officer Sorenson asked Pope what had happened before Officer Sorenson arrived, to which Pope responded that he "hit the big bump," and continued to repeat the statement about the bump.

6

Officer Landers then arrived on the scene.  Officer Sorenson also states that Las Vegas Fire Department Rescue 41 also arrived, and that one or several firefighters had contact with Pope, and determined that there was not a medical emergency.[2]  Officer Sorenson got assistance getting Pope into the back seat of his patrol car.  Around 5:48 a.m., Officer Sorenson's supervisor, Sergeant Mueller, arrived on the scene.  By about 6:30, Officer Sorenson had transported Pope to the jail.

In his testimony, Pope recalled arriving at the jail, and being taken into the jail in a wheelchair, with his hands cuffed behind his back, which caused a lot of pain.  Pope could not recall having a conversation with Sorenson at the jail.  He recalled that, after being placed on a guerney, he talked with a female.  Pope also recalled being transported from the jail to Sunrise Hospital.  He remembered someone trying to put a neck brace on him.  A female told him to "just settle down, you are getting out of here.  You are going to the hospital."  Pope states that, in response, he calmed down (but doesn't know if they gave him anything or not) and they went to Sunrise.  Pope remembers "trying to talk and everything was gibberish. . . ."  Pope then testified that, other than the clock standing still, he could not remember any events that occurred during the first days he was at Sunrise Hospital.

Officer Sorensen states, in his affidavit, that a nurse conducted a medical screening of Pope at the jail, and she had Officer Sorensen contact dispatch to have an ambulance transport Pope to a hospital.

The paramedics arrived at the jail shortly around 7:15 a.m., and departed for Sunrise Hospital at about 8:00 a.m.  The paramedics noted, as History of Present Illness: "Acute onset Altered Level of Consciousness."  They also noted, as Primary and Secondary Impression, respectively: "Toxicological - Alchohol Abuse" and "Toxicological -

---

[2] Pope asserts that LVFD Rescue 41 did not have any contact with Pope, but has not submitted any competent evidence in support of the assertion.

7

Other Medication Abuse." The paramedics noted Pope had an abrasion under his right eye and down his right cheek. Pope stated his lower back hurt and kept rubbing his back. The paramedics placed Pope into "full cspine precations [sic], and placed into four point restraints." They further noted Pope was "becoming very combative" and kept screaming that he couldn't breathe. The paramedics attempted to start an IV, but were unsuccessful as Pope kept pulling his arm away. Finally, the paramedics noted that Pope wouldn't answer any questions.

As indicated on the "Clinical Report - Nurses" for Sunrise Hospital, Pope was triaged at 8:28 a.m., with a chief complaint of injury to forehead and face. He was disoriented as to place, time and situation. Pope's pupils were sluggishly reactive, and he had upper lip swelling. (In a late entry, it was also noted that Pope had a small circular abrasion on the left side of his sacrum.) By 8:39, an IV access was accomplished on one attempt, and a blood sample was taken. By 9:07, Pope began receiving sedative drugs, and his "mood/affect" was noted as "abnormal (anxious, restless and agitated)."

The "Clinical Report - Physicians/Mid-levels" records, for 8:57 a.m., that Pope's medical history was "limited by altered mental status." The chief complaint was "Injury to Head." The doctor noted, under physical exam: "Appearance: C-collar in place. Anxious. (adjitated [sic] and combative)."

Ultimately, as defendants acknowledge in their moving papers, an MRI was performed and a radiologist determined that Pope had suffered an L4 superior end plate compression fracture that was new and acute (in addition to his pre-existing spinal injury).

Analysis

At its essence, the defendants argue that Pope lacks any evidence that Officer Sorensen used any force other than what Officer Sorensen reported he used in response to an individual resisting arrest. The only account of what occurred, the defendants

8

conclude, establishes that Officer Sorensen is entitled to qualified immunity for his conduct. The defendants also argue that Pope's state law battery claim must fail, as such a claim against a police officer also requires a showing that a police officer used unreasonable force. Further, the intentional infliction of emotional distress claim must fail as Pope cannot offer any evidence of extreme and outrageous conduct by the defendants.

The defendants further argue that Pope has also failed to offer any evidence of an LVMPD policy or custom that would cause Officer Sorensen to violate Pope's Fourth Amendment rights. Finally, the defendants argue that Pope lacks any evidence that the LVMPD suffers a systemic inadequacy in hiring, training, or supervising its officers, warranting judgment against Pope on his negligence claim.

Construed broadly, Pope's opposition appears to raise two arguments. He appears to argue that a jury issue exists whether Officer Sorensen knew he used excessive force against Pope, which amount of force he then attempted to justify by falsely reporting that Pope attempted to run away on foot. Pope also appears to argue that a jury issue exists whether the force used and the context in which it was used, as reported by Officer Sorensen, was excessive.

Pope's primary argument, repeated often throughout his opposition, is that Officer Sorensen falsely reported that Pope attempted to run away. The assertion is unsupported by any competent evidence. In support of the assertion, Pope appears to refer to statements recorded in the Clinical Reports of the Sunrise Hospital nurses and physicians that, in essence, assert that the police reported that Pope attempted to run away. The defendants have moved to exclude these statements as hearsay, and Pope has opposed that motion.

The defendants are correct that the statements are hearsay and are not admissible under an exception to the rule against the admission of hearsay. Pope argues that the statements are not hearsay, because he is not offering them to establish that Pope was, in

9

fact, running away when Officer Sorensen tackled him.  Instead, he argues that he is offering them "to prove METRO has made multiple false and inconsistent statements. . . ." He further argues that the "significance of the statements in question lay solely in the fact that they were made by METRO."  Pope's arguments best demonstrate that the statements are hearsay.  As he argues, he is offering the statements to establish that the police made the statements.  He is not offering the statements merely to show that someone made the statement.  He is offering the statements to show that the police made the statements. Offering an out-of-court statement that "the LVMPD stated . . ." to prove that "the LVMPD stated . . ." is, by definition, hearsay.  The statements become hearsay upon hearsay when the statement, itself, reveals that its speaker is not relying upon first-hand knowledge of what the police said, but the report of some other person.  Offering someone's statement that someone else reported that a police officer said something, which is offered to prove that someone else said that the police officer said something is hearsay upon hearsay.

Pope argues that the statements are admissions by a party opponent.  He is incorrect.  The statements are the statements of doctors and nurses, not Officer Sorensen nor the LVPMD.

Pope argues the statements are admissible as an exception to the hearsay rule. Again, he is incorrect.  As Pope has clearly stated, the statement at issue, the significant statement upon which he relies, is that "the police said . . ."  The statement "the police said . . ." is not reasonably pertinent to a medical diagnosis.  Further, the statements themselves are not admissible under Rule of Evidence 803(6).  Assuming that the Clinical Records (which are hearsay) are otherwise admissible as a record of regularly conducted activity, hearsay statements within the Clinical Records (such as a statement that "the police said . . .") do not qualify for this exception merely because they are recorded in an 803(6) document.  Further, 803(6) requires a showing that "source of the information" does not indicate a lack of trustworthiness.  Pope has not shown that the source of information

does not indicate a lack of trustworthiness. Rather, the record as a whole and the clinical records themselves indicate the opposite. The statements at issue are not first-hand reports of what a police officer said, but a second-hand account of what someone said the police said. As Pope argues, the statement in the nurses' Clinical Report are "either a recitation" of what the police told the nurses, or what the paramedics told the nurses that the police said. That the statement is, itself, ambiguous as to its source precludes a finding of an exception to the hearsay rule.

The first statement in the doctors' Clinical Report (which begins "PER EMS:") plainly establishes the statement is hearsay within hearsay. The second statement ("ATTEMPTED TO CALL POLICE"), as well as the third statement in the doctors' Clinical Report ("11:36. POLICE STATE THAT . . .") suggests the speaker (whom Pope identifies as Dr. Henner) was making first-hand reports. In his deposition, however, Dr. Henner could not attribute the information to any person or even recall how he received the information recited in the Clinical Report. (Sergeant Mueller, who is not a desk sergeant, has submitted and signed an affidavit indicating that he did receive a call, but that it was from a nurse, and that he did not read from a report, as such was not available to him while he was talking with the nurse. Sergeant Mueller further indicated that the nurse said that her source of information was paramedics. Sergeant Mueller also informed the nurse that the information regarding the arrest, as conveyed by the paramedics, was was not accurate.) As the source of the information being reported by Dr. Henner is not known (and appears to be hearsay upon hearsay upon hearsay), the statements are not admissible as exceptions to the hearsay rule.

Therefore, the Court will grant defendants' motion to exclude these statements as hearsay.

Lacking evidence that Officer Sorensen falsely reported that Pope attempted to run away, the issue that remains is whether Officer Sorensen is entitled to qualified immunity

11

for his admitted use of force.  This question must be resolved in the context of the events that occurred as shown by the evidence properly before this court.  Pope has testified that he had been driving since 2:00 a.m., initially with the purpose of finding a specific intersection, and then with the purpose of getting home despite being lost.  Pope had become sufficiently lost that, while traveling north, he believed he was driving south.  Pope was observed near the end of this drive by the Tuttles, who called 911, because Pope's driving lead them to believe he was drunk.  The Tuttles observed Pope driving all over the road and driving his vehicle such that it hit several dips rather hard.

As observed by the Tuttles, and conceded by Pope, Pope drove his car until it bottomed out and died after going from paved road onto a dirt road.  Pope testified that, when asked by an officer as to what happened, he responded, "I hit a ditch."  Tuttle believed the driver had broken his vehicle, attributing the cause to the hard hits of the vehicle on the dips.

Officer Sorensen responded to the scene as a drunk driver call, having been informed the vehicle had been swerving on the road and possibly had an accident.  Pope testified that two cars and four officers responded to the scene, but has not offered any evidence identifying the officers.  He has further testified that, after answering two questions posed by an officer, he has no recollection of any subsequent events until becoming aware that he was handcuffed and in the back seat of a police vehicle.

Officer Sorensen states that he told Pope to walk to the front of the patrol car, but received an incoherent response, and then a second response to wait one second, after which Pope reached into his vehicle.  Officer Sorensen states that this conduct raised his level of concern to cause him to draw his firearm.  Pope then began patting his waistband as if searching for something located on his body.  (Ultimately, Officer Sorensen would discover that Pope had a firearm in a holster in his waistband.)  Officer Sorensen issued

commands to Pope to move in a direction away from the officer. Pope did not comply. Rather, Pope moved towards Officer Sorensen using the car for balance.

Officer Sorensen acknowledges attempting to handcuff Pope while Pope was leaning forward on the car for balance, and had his back to the officer. Officer Sorensen acknowledges taking Pope to the ground after Pope attempted to break free from his grasp.

Finally, while Pope remembers only certain aspects of that morning, persons who observed Pope after the arrest noted what the paramedics termed an altered level of consciousness. Pope was also variously observed as combative, agitated, and non-responsive. Pope recalls that, at one point, he could only respond with gibberish.

In short, the undisputed evidence is that Pope (though now known to not have been drunk) was exhibiting behavior consistent with that of a drunk driver who not complying the instructions of a police officer, but instead was acting in a way that caused the officer concern for his own safety. While Pope reiterates his physical condition resulting from his prior spinal injury, that physical condition did not preclude him from acting and behaving in the manner observed by Officer Sorensen. (Indeed, as this matter is before the Court on the question of whether Officer Sorensen is entitled to qualified immunity, some of Pope's acts, such as using a car for balance, must be considered as it would be viewed by Officer Sorensen, who was responding to a drunk driver call.) When presented with an advantageous opportunity to handcuff Pope (when Pope was leaning on the vehicle with his back to Officer Sorensen), Officer Sorensen attempted to handcuff him. The Court cannot conclude that, in this context, Officer Sorensen's attempt to handcuff Pope was an objectively unreasonable use of force.

In response to Officer Sorensen's attempt to handcuff him, Pope attempted to break free, pulling his hands away from Officer Sorensen. Officer Sorensen responded by taking Pope to the ground, and then handcuffing Pope. Pope suggests the force was excessive

as shown by the fact that Officer Sorensen broke his back. The evidence in the record, however, establishes several events in which significant force was applied to Pope, including bottoming out a vehicle sufficiently hard as to cause it to die as well as Officer Sorensen's application of force. However, assuming that Pope's back was broken during Officer Sorensen's use of force in taking him to the ground, such fact does not create a triable issue of fact whether the amount of force used was objectively unreasonable. Injuries can result from both objectively reasonable and objectively unreasonable applications of force, and again context is critical. As Pope has reminded this Court, and as supported by evidence, he was an individual with an existing spinal injury. That injury caused a weakening of Pope's spine. Qualified immunity allows an officer to respond with the force he believes is necessary at that moment. The protection of qualified immunity does not require an officer to first obtain a medical history from an individual who is otherwise not obeying an officer's instructions before applying the force the officer believes is necessary to handcuff a resisting individual. In sum, the Court finds that Officer Sorensen is entitled to qualified immunity.

Pope has not offered competent evidence that Officer Sorensen's actions were the result of a LVMPD policy, custom or practice that its officers use excessive force in arresting possibly drunk, non-complying individuals. Further, he has not shown that he can maintain any of his state causes of action. Therefore, for good cause shown,

THE COURT **ORDERS** that Defendants' Motion for Leave to File Reply (#33) is GRANTED;

THE COURT FURTHER **ORDERS** that Defendants' Motion in Limine re: Hearsay Statements Recorded in Nurse's and Physician's Emergency Room Medical Records (#28) is GRANTED;

THE COURT FURTHER **ORDERS** that Defendants' Motion in Limine re: Plaintiff's Police Practice Expert (#38) is GRANTED;

14

THE COURT FURTHER **ORDERS** that Defendants' Motion for Summary Judgment (#26) is GRANTED;

THE COURT FURTHER **ORDERS** that Defendants' Motion for Partial Judgment on the Pleadings (#18) is DENIED as moot;

THE COURT FURTHER **ORDERS** that Plaintiff's Motion to Amend/Correct Complaint (#20) is DENIED as moot.

DATED this 18 day of March, 2014.

_____
Lloyd D. George
United States District Judge